Justice SOTOMAYOR delivered the opinion of the Court.
*1940 In Kokesh v. SEC , 581 U. S. ----, 137 S.Ct. 1635, 198 L.Ed.2d 86 (2017), this Court held that a disgorgement order in a Securities and Exchange Commission (SEC) enforcement action imposes a "penalty" for the purposes of 28 U.S.C. § 2462, the applicable statute of limitations. In so deciding, the Court reserved an antecedent question: whether, and to what extent, the SEC may seek "disgorgement" in the first instance through its power to award "equitable relief " under 15 U.S.C. § 78u(d)(5), a power that historically excludes punitive sanctions. The Court holds today that a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under § 78u(d)(5). The judgment is vacated, and the case is remanded for the courts below to ensure the award was so limited.
I
A
Congress authorized the SEC to enforce the Securities Act of 1933, 48 Stat. 74, as amended, 15 U.S.C. § 77a et seq. , and the Securities Exchange Act of 1934, 48 Stat. 881, as amended, 15 U.S.C. § 78a et seq ., and to punish securities fraud through administrative and civil proceedings. In administrative proceedings, the SEC can seek limited civil penalties and "disgorgement." See § 77h-1(e) ("In any cease-and-desist proceeding under subsection (a), the Commission may enter an order requiring accounting and disgorgement"); see also § 77h-1(g) ("Authority to impose money penalties"). In civil actions, the SEC can seek civil penalties and "equitable relief." See, e.g. , § 78u(d)(5) ("In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, ... any Federal court may grant ... any equitable relief that may be appropriate or necessary for the benefit of investors"); see also § 78u(d)(3) ("Money penalties in civil actions" (quotation modified)).
Congress did not define what falls under the umbrella of "equitable relief." Thus, courts have had to consider which remedies the SEC may impose as part of its § 78u(d)(5) powers.
Starting with SEC v. Texas Gulf Sulphur Co. , 446 F.2d 1301 (CA2 1971), courts determined that the SEC had authority to obtain what it called "restitution," and what in substance amounted to "profits" that "merely depriv[e]" a defendant of "the gains of ... wrongful conduct." Id. , at 1307-1308. Over the years, the SEC has continued to request this remedy, later referred to as "disgorgement,"[1] and courts have continued to *1941 award it. See SEC v. Commonwealth Chemical Securities, Inc. , 574 F.2d 90, 95 (CA2 1978) (explaining that, when a court awards "[d]isgorgement of profits in an action brought by the SEC," it is "exercising the chancellor's discretion to prevent unjust enrichment"); see also SEC v. Blatt , 583 F.2d 1325, 1335 (CA5 1978) ; SEC v. Washington Cty. Util. Dist. , 676 F.2d 218, 227 (CA6 1982).
In Kokesh , this Court determined that disgorgement constituted a "penalty" for the purposes of 28 U.S.C. § 2462, which establishes a 5-year statute of limitations for "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture." The Court reached this conclusion based on several considerations, namely, that disgorgement is imposed as a consequence of violating public laws, it is assessed in part for punitive purposes, and in many cases, the award is not compensatory. 581 U. S., at ---- - ----, 137 S.Ct., at 1643-1644. But the Court did not address whether a § 2462 penalty can nevertheless qualify as "equitable relief " under § 78u(d)(5), given that equity never "lends its aid to enforce a forfeiture or penalty." Marshall v. Vicksburg , 15 Wall. 146, 149, 21 L.Ed. 121 (1873). The Court cautioned, moreover, that its decision should not be interpreted "as an opinion on whether courts possess authority to order disgorgement in SEC enforcement proceedings." Kokesh , 581 U. S., at ----, n. 3, 137 S.Ct., at 1642 n. 3. This question is now squarely before the Court.
B
The SEC action and disgorgement award at issue here arise from a scheme to defraud foreign nationals. Petitioners Charles Liu and his wife, Xin (Lisa) Wang, solicited nearly $27 million from foreign investors under the EB-5 Immigrant Investor Program (EB-5 Program). 754 Fed.Appx. 505, 506 (CA9 2018) (case below). The EB-5 Program, administered by the U. S. Citizenship and Immigration Services, permits noncitizens to apply for permanent residence in the United States by investing in approved commercial enterprises that are based on "proposals for promoting economic growth." See USCIS, EB-5 Immigrant Investor Program, https://www.uscis.gov/eb-5. Investments in EB-5 projects are subject to the federal securities laws.
Liu sent a private offering memorandum to prospective investors, pledging that the bulk of any contributions would go toward the construction costs of a cancer-treatment center. The memorandum specified that only amounts collected from a small administrative fee would fund " 'legal, accounting and administration expenses.' " 754 Fed.Appx. at 507. An SEC investigation revealed, however, that Liu spent nearly $20 million of investor money on ostensible marketing expenses and salaries, an amount far more than what the offering memorandum permitted and far in excess of the administrative fees collected.
*1942 262 F.Supp.3d 957, 960-964 (CD Cal. 2017). The investigation also revealed that Liu diverted a sizable portion of those funds to personal accounts and to a company under Wang's control. Id. , at 961, 964. Only a fraction of the funds were put toward a lease, property improvements, and a proton-therapy machine for cancer treatment. Id. , at 964-965.
The SEC brought a civil action against petitioners, alleging that they violated the terms of the offering documents by misappropriating millions of dollars. The District Court found for the SEC, granting an injunction barring petitioners from participating in the EB-5 Program and imposing a civil penalty at the highest tier authorized. Id. , at 975, 976. It also ordered disgorgement equal to the full amount petitioners had raised from investors, less the $234,899 that remained in the corporate accounts for the project. Id. , at 975-976.
Petitioners objected that the disgorgement award failed to account for their business expenses. The District Court disagreed, concluding that the sum was a "reasonable approximation of the profits causally connected to [their] violation." Ibid. The court ordered petitioners jointly and severally liable for the full amount that the SEC sought. App. to Pet. for Cert. 62a.
The Ninth Circuit affirmed. It acknowledged that Kokesh "expressly refused to reach" the issue whether the District Court had the authority to order disgorgement. 754 Fed.Appx. at 509. The court relied on Circuit precedent to conclude that the "proper amount of disgorgement in a scheme such as this one is the entire amount raised less the money paid back to the investors." Ibid. ; see also SEC v. JT Wallenbrock & Assocs. , 440 F.3d 1109, 1113, 1114 (CA9 2006) (reasoning that it would be "unjust to permit the defendants to offset ... the expenses of running the very business they created to defraud ... investors").
We granted certiorari to determine whether § 78u(d)(5) authorizes the SEC to seek disgorgement beyond a defendant's net profits from wrongdoing. 589 U. S. ----, 140 S.Ct. 451, 205 L.Ed.2d 265 (2019).
II
Our task is a familiar one. In interpreting statutes like § 78u(d)(5) that provide for "equitable relief," this Court analyzes whether a particular remedy falls into "those categories of relief that were typically available in equity." Mertens v. Hewitt Associates , 508 U.S. 248, 256, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993) ; see also CIGNA Corp. v. Amara , 563 U.S. 421, 439, 131 S.Ct. 1866, 179 L.Ed.2d 843 (2011) ; Montanile v. Board of Trustees of Nat. Elevator Industry Health Benefit Plan , 577 U. S. 136, 142, 136 S.Ct. 651, 193 L.Ed.2d 556 (2016). The "basic contours of the term are well known" and can be discerned by consulting works on equity jurisprudence. Great-West Life & Annuity Ins. Co. v. Knudson , 534 U.S. 204, 217, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002).
These works on equity jurisprudence reveal two principles. First, equity practice long authorized courts to strip wrongdoers of their ill-gotten gains, with scholars and courts using various labels for the remedy. Second, to avoid transforming an equitable remedy into a punitive sanction, courts restricted the remedy to an individual wrongdoer's net profits to be awarded for victims.
A
Equity courts have routinely deprived wrongdoers of their net profits from unlawful activity, even though that remedy may have gone by different names. Compare, e.g. , 1 D. Dobbs, Law of Remedies *1943 § 4.3(5), p. 611 (1993) ("Accounting holds the defendant liable for his profits"), with id. , § 4.1(1), at 555 (referring to "restitution" as the relief that "measures the remedy by the defendant's gain and seeks to force disgorgement of that gain"); see also Restatement (Third) of Restitution and Unjust Enrichment § 51, Comment a , p. 204 (2010) (Restatement (Third)) ("Restitution measured by the defendant's wrongful gain is frequently called 'disgorgement.' Other cases refer to an 'accounting' or an 'accounting for profits' "); 1 J. Pomeroy, Equity Jurisprudence § 101, p. 112 (4th ed. 1918) (describing an accounting as an equitable remedy for the violation of strictly legal primary rights).
No matter the label, this "profit-based measure of unjust enrichment," Restatement (Third) § 51, Comment a , at 204, reflected a foundational principle: "[I]t would be inequitable that [a wrongdoer] should make a profit out of his own wrong," Root v. Railway Co. , 105 U.S. 189, 207, 26 L.Ed. 975 (1882). At the same time courts recognized that the wrongdoer should not profit "by his own wrong," they also recognized the countervailing equitable principle that the wrongdoer should not be punished by "pay[ing] more than a fair compensation to the person wronged." Tilghman v. Proctor , 125 U.S. 136, 145-146, 8 S.Ct. 894, 31 L.Ed. 664 (1888).
Decisions from this Court confirm that a remedy tethered to a wrongdoer's net unlawful profits, whatever the name, has been a mainstay of equity courts. In Porter v. Warner Holding Co. , 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946), the Court interpreted a section of the Emergency Price Control Act of 1942 that encompassed a "comprehensiv[e]" grant of "equitable jurisdiction." Id. , at 398, 66 S.Ct. 1086. "[O]nce [a District Court's] equity jurisdiction has been invoked" under that provision, the Court concluded, "a decree compelling one to disgorge profits ... may properly be entered." Id. , at 398-399, 66 S.Ct. 1086.
Subsequent cases confirm the " 'protean character' of the profits-recovery remedy." Petrella v. Metro-Goldwyn-Mayer, Inc. , 572 U.S. 663, 668, n. 1, 134 S.Ct. 1962, 188 L.Ed.2d 979 (2014). In Tull v. United States , 481 U.S. 412, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987), the Court described "disgorgement of improper profits" as "traditionally considered an equitable remedy." Id. , at 424, 107 S.Ct. 1831. While the Court acknowledged that disgorgement was a "limited form of penalty" insofar as it takes money out of the wrongdoer's hands, it nevertheless compared disgorgement to restitution that simply " 'restor[es] the status quo,' " thus situating the remedy squarely within the heartland of equity. Ibid.[2] In Great-West , the Court noted that an "accounting for profits" was historically a "form of equitable restitution." 534 U.S. at 214, n. 2, 122 S.Ct. 708. And in Kansas v. Nebraska , 574 U.S. 445, 135 S.Ct. 1042, 191 L.Ed.2d 1 (2015), a " 'basically equitable' " original jurisdiction proceeding, the Court ordered disgorgement of Nebraska's *1944 gains from exceeding its allocation under an interstate water compact. Id. , at 453, 475, 135 S.Ct. 1042.
Most recently, in SCA Hygiene Products Aktiebolag v. First Quality Baby Products, LLC , 580 U. S. ----, 137 S.Ct. 954, 197 L.Ed.2d 292 (2017), the Court canvassed pre-1938 patent cases invoking equity jurisdiction. It noted that many cases sought an "accounting," which it described as an equitable remedy requiring disgorgement of ill-gotten profits. Id. , at ----, 137 S.Ct, at. 964. This Court's "transsubstantive guidance on broad and fundamental" equitable principles, Romag Fasteners, Inc. v. Fossil Group, Inc. , 590 U. S. ----, ----, 140 S.Ct. 1492, 1496, 206 L.Ed.2d 672 (2020), thus reflects the teachings of equity treatises that identify a defendant's net profits as a remedy for wrongdoing.
Contrary to petitioners' argument, equity courts did not limit this remedy to cases involving a breach of trust or of fiduciary duty. Brief for Petitioners 28-29. As petitioners acknowledge, courts authorized profits-based relief in patent-infringement actions where no such trust or special relationship existed. Id. , at 29; see also Root , 105 U.S. at 214 ("[I]t is nowhere said that the patentee's right to an account is based upon the idea that there is a fiduciary relation created between him and the wrong-doer by the fact of infringement").
Petitioners attempt to distinguish these patent cases by suggesting that an "accounting" was appropriate only because Congress explicitly conferred that remedy by statute in 1870. Brief for Petitioners 29 (citing the Act of July 8, 1870, § 55, 16 Stat. 206). But patent law had not previously deviated from the general principles outlined above: This Court had developed the rule that a plaintiff may "recover the amount of ... profits that the defendants have made by the use of his invention" through "a series of decisions under the patent act of 1836, which simply conferred upon the courts of the United States general equity jurisdiction ... in cases arising under the patent laws." Tilghman , 125 U.S. at 144, 8 S.Ct. 894. The 1836 statute, in turn, incorporated the substance of an earlier statute from 1819 which granted courts the ability to "proceed according to the course and principles of courts of equity" to "prevent the violation of patent-rights." Root , 105 U.S. at 193. Thus, as these cases demonstrate, equity courts habitually awarded profits-based remedies in patent cases well before Congress explicitly authorized that form of relief.
B
While equity courts did not limit profits remedies to particular types of cases, they did circumscribe the award in multiple ways to avoid transforming it into a penalty outside their equitable powers. See Marshall , 15 Wall. at 149.
For one, the profits remedy often imposed a constructive trust on wrongful gains for wronged victims. The remedy itself thus converted the wrongdoer, who in many cases was an infringer, "into a trustee, as to those profits, for the owner of the patent which he infringes." Burdell v. Denig , 92 U.S. 716, 720, 23 L.Ed. 764 (1876). In "converting the infringer into a trustee for the patentee as regards the profits thus made," the chancellor "estimat[es] the compensation due from the infringer to the patentee." Packet Co. v. Sickles , 19 Wall. 611, 617-618, 22 L.Ed. 203 (1874) ; see also Clews v. Jamieson , 182 U.S. 461, 480, 21 S.Ct. 845, 45 L.Ed. 1183 (1901) (describing an accounting as involving a " 'distribution of the trust moneys among all the beneficiaries who are entitled to share therein' " in an action against the governing committee of a stock exchange).
*1945 Equity courts also generally awarded profits-based remedies against individuals or partners engaged in concerted wrongdoing, not against multiple wrongdoers under a joint-and-several liability theory. See Ambler v. Whipple , 20 Wall. 546, 559, 22 L.Ed. 403 (1874) (ordering an accounting against a partner who had "knowingly connected himself with and aided in ... fraud"). In Elizabeth v. Pavement Co. , 97 U.S. 126, 24 L.Ed. 1000 (1878), for example, a city engaged contractors to install pavement in a manner that infringed a third party's patent. The patent holder brought a suit in equity to recover profits from both the city and its contractors. The Court held that only the contractors (the only parties to make a profit) were responsible, even though the parties answered jointly. Id. , at 140 ; see also ibid. (rejecting liability for an individual officer who merely acted as an agent of the defendant and received a salary for his work). The rule against joint-and-several liability for profits that have accrued to another appears throughout equity cases awarding profits. See, e.g. , Belknap v. Schild , 161 U.S. 10, 25-26, 16 S.Ct. 443, 40 L.Ed. 599 (1896) ("The defendants, in any such suit, are therefore liable to account for such profits only as have accrued to themselves from the use of the invention, and not for those which have accrued to another, and in which they have no participation"); Keystone Mfg. Co. v. Adams , 151 U.S. 139, 148, 14 S.Ct. 295, 38 L.Ed. 103 (1894) (reversing profits award that was based not on what defendant had made from infringement but on what third persons had made from the use of the invention); Jennings v. Carson , 4 Cranch 2, 21, 2 L.Ed. 531 (1807) (holding that an order requiring restitution could not apply to "those who were not in possession of the thing to be restored" and "had no power over it") (citing Penhallow v. Doane's Administrators , 3 Dall. 54, 1 L.Ed. 507 (1795) (reversing a restitution award in admiralty that ordered joint damages in excess of what each defendant received)).
Finally, courts limited awards to the net profits from wrongdoing, that is, "the gain made upon any business or investment, when both the receipts and payments are taken into the account." Rubber Co. v. Goodyear , 9 Wall. 788, 804, 19 L.Ed. 566 (1870) ; see also Livingston v. Woodworth , 15 How. 546, 559-560, 14 L.Ed. 809 (1854) (restricting an accounting remedy "to the actual gains and profits ... during the time" the infringing machine "was in operation and during no other period" to avoid "convert[ing] a court of equity into an instrument for the punishment of simple torts"); Seymour v. McCormick , 16 How. 480, 490, 14 L.Ed. 1024 (1854) (rejecting a blanket rule that infringing one component of a machine warranted a remedy measured by the full amounts of the profits earned from the machine); Mowry v. Whitney , 14 Wall. 620, 649, 20 L.Ed. 860 (1872) (vacating an accounting that exceeded the profits from infringement alone); Wooden-Ware Co. v. United States , 106 U.S. 432, 434-435, 1 S.Ct. 398, 27 L.Ed. 230 (1882) (explaining that an innocent trespasser is entitled to deduct labor costs from the gains obtained by wrongfully harvesting lumber).
The Court has carved out an exception when the "entire profit of a business or undertaking" results from the wrongful activity. Root , 105 U.S. at 203. In such cases, the Court has explained, the defendant "will not be allowed to diminish the show of profits by putting in unconscionable claims for personal services or other inequitable deductions." Ibid. In Goodyear , for example, the Court affirmed an accounting order that refused to deduct expenses under this rule. The Court there found that materials for which expenses were claimed *1946 were bought for the purposes of the infringement and "extraordinary salaries" appeared merely to be "dividends of profit under another name." 9 Wall. at 803 ; see also Callaghan v. Myers , 128 U.S. 617, 663-664, 9 S.Ct. 177, 32 L.Ed. 547 (1888) (declining to deduct a defendant's personal and living expenses from his profits from copyright violations, but distinguishing the expenses from salaries of officers in a corporation).
Setting aside that circumstance, however, courts consistently restricted awards to net profits from wrongdoing after deducting legitimate expenses. Such remedies, when assessed against only culpable actors and for victims, fall comfortably within "those categories of relief that were typically available in equity." Mertens , 508 U.S. at 256, 113 S.Ct. 2063.
C
By incorporating these longstanding equitable principles into § 78u(d)(5), Congress prohibited the SEC from seeking an equitable remedy in excess of a defendant's net profits from wrongdoing. To be sure, the SEC originally endeavored to conform its disgorgement remedy to the common-law limitations in § 78u(d)(5). Over the years, however, courts have occasionally awarded disgorgement in three main ways that test the bounds of equity practice: by ordering the proceeds of fraud to be deposited in Treasury funds instead of disbursing them to victims, imposing joint-and-several disgorgement liability, and declining to deduct even legitimate expenses from the receipts of fraud.[3] The SEC's disgorgement remedy in such incarnations is in considerable tension with equity practices.
Petitioners go further. They claim that this Court effectively decided in Kokesh that disgorgement is necessarily a penalty, and thus not the kind of relief available at equity. Brief for Petitioners 19-20, 22-26. Not so. Kokesh expressly declined to pass on the question. 581 U. S., at ----, n. 3, 137 S.Ct. at 1642 n.3. To be sure, the Kokesh Court evaluated a version of the SEC's disgorgement remedy that seemed to exceed the bounds of traditional equitable principles. But that decision has no bearing on the SEC's ability to conform future requests for a defendant's profits to the limits outlined in common-law cases awarding a wrongdoer's net gains.
The Government, for its part, contends that the SEC's interpretation of the equitable disgorgement remedy has Congress' tacit support, even if it exceeds the bounds of equity practice. Brief for Respondent 13-21. It points to the fact that Congress has enacted a number of other statutes referring to "disgorgement."
That argument attaches undue significance to Congress' use of the term. It is true that Congress has authorized the SEC to seek "disgorgement" in administrative actions. 15 U.S.C. § 77h-1(e) ("In any cease-and-desist proceeding under subsection (a), the Commission may enter an order requiring accounting and disgorgement"). But it makes sense that Congress would expressly name the equitable powers it grants to an agency for use in administrative proceedings. After all, agencies are unlike federal courts where, *1947 "[u]nless otherwise provided by statute, all ... inherent equitable powers ... are available for the proper and complete exercise of that jurisdiction." Porter , 328 U.S. at 398, 66 S.Ct. 1086.
Congress does not enlarge the breadth of an equitable, profit-based remedy simply by using the term "disgorgement" in various statutes. The Government argues that under the prior-construction principle, Congress should be presumed to have been aware of the scope of "disgorgement" as interpreted by lower courts and as having incorporated the (purportedly) prevailing meaning of the term into its subsequent enactments. Brief for Respondent 24. But "that canon has no application" where, among other things, the scope of disgorgement was "far from 'settled.' " Armstrong v. Exceptional Child Center, Inc. , 575 U.S. 320, 330, 135 S.Ct. 1378, 191 L.Ed.2d 471 (2015).
At bottom, even if Congress employed "disgorgement" as a shorthand to cross-reference the relief permitted by § 78u(d)(5), it did not silently rewrite the scope of what the SEC could recover in a way that would contravene limitations embedded in the statute. After all, such "statutory reference[s]" to a remedy grounded in equity "must, absent other indication, be deemed to contain the limitations upon its availability that equity typically imposes." Great-West , 534 U.S. at 211, n. 1, 122 S.Ct. 708. Accordingly, Congress' own use of the term "disgorgement" in assorted statutes did not expand the contours of that term beyond a defendant's net profits-a limit established by longstanding principles of equity.
III
Applying the principles discussed above to the facts of this case, petitioners briefly argue that their disgorgement award is unlawful because it crosses the bounds of traditional equity practice in three ways: It fails to return funds to victims, it imposes joint-and-several liability, and it declines to deduct business expenses from the award. Because the parties focused on the broad question whether any form of disgorgement may be ordered and did not fully brief these narrower questions, we do not decide them here. We nevertheless discuss principles that may guide the lower courts' assessment of these arguments on remand.
A
Section 78u(d)(5) restricts equitable relief to that which "may be appropriate or necessary for the benefit of investors." The SEC, however, does not always return the entirety of disgorgement proceeds to investors, instead depositing a portion of its collections in a fund in the Treasury. See SEC, Division of Enforcement, 2019 Ann. Rep. 16-17, https://www.sec.gov/files/enforcement-annual-report-2019.pdf. Congress established that fund in the Dodd-Frank Wall Street Reform and Consumer Protection Act for disgorgement awards that are not deposited in "disgorgement fund[s]" or otherwise "distributed to victims." 124 Stat. 1844. The statute provides that these sums may be used to pay whistleblowers reporting securities fraud and to fund the activities of the Inspector General. Ibid. Here, the SEC has not returned the bulk of funds to victims, largely, it contends, because the Government has been unable to collect them.[4]
The statute provides limited guidance as to whether the practice of depositing a *1948 defendant's gains with the Treasury satisfies the statute's command that any remedy be "appropriate or necessary for the benefit of investors." The equitable nature of the profits remedy generally requires the SEC to return a defendant's gains to wronged investors for their benefit. After all, the Government has pointed to no analogous common-law remedy permitting a wrongdoer's profits to be withheld from a victim indefinitely without being disbursed to known victims. Cf. Root , 105 U.S. at 214-215 (comparing the accounting remedy to a breach-of-trust action, where a court would require the defendant to "refund the amount of profit which they have actually realized").
The Government maintains, however, that the primary function of depriving wrongdoers of profits is to deny them the fruits of their ill-gotten gains, not to return the funds to victims as a kind of restitution. See, e.g. , SEC, Report Pursuant to Section 308(C) of the Sarbanes Oxley Act of 2002, p. 3, n. 2 (2003) (taking the position that disgorgement is not intended to make investors whole, but rather to deprive wrongdoers of ill-gotten gains); see also 6 T. Hazen, Law of Securities Regulation § 16.18, p. 8 (rev. 7th ed. 2016) (concluding that the remedial nature of the disgorgement remedy does not mean that it is essentially compensatory and concluding that the "primary function of the remedy is to deny the wrongdoer the fruits of ill-gotten gains"). Under the Government's theory, the very fact that it conducted an enforcement action satisfies the requirement that it is "appropriate or necessary for the benefit of investors."
But the SEC's equitable, profits-based remedy must do more than simply benefit the public at large by virtue of depriving a wrongdoer of ill-gotten gains. To hold otherwise would render meaningless the latter part of § 78u(d)(5). Indeed, this Court concluded similarly in Mertens when analyzing statutory language accompanying the term "equitable remedy." 508 U.S. at 253, 113 S.Ct. 2063 (interpreting the term "appropriate equitable relief "). There, the Court found that the additional statutory language must be given effect since the section "does not, after all, authorize ... 'equitable relief ' at large ." Ibid. As in Mertens , the phrase "appropriate or necessary for the benefit of investors" must mean something more than depriving a wrongdoer of his net profits alone, else the Court would violate the "cardinal principle of interpretation that courts must give effect, if possible, to every clause and word of a statute." Parker Drilling Management Services, Ltd. v. Newton , 587 U. S. ----, ----, 139 S.Ct. 1881, 1890, 204 L.Ed.2d 165 (2019) (internal quotation marks omitted).
The Government additionally suggests that the SEC's practice of depositing disgorgement funds with the Treasury may be justified where it is infeasible to distribute the collected funds to investors.[5] Brief for Respondent 37. It is an open question whether, and to what extent, that practice nevertheless satisfies the SEC's obligation to award relief "for the benefit of investors" and is consistent with the limitations of § 78u(d)(5). The parties have not identified authorities revealing what traditional equitable principles govern when, for instance, the wrongdoer's profits cannot *1949 practically be disbursed to the victims. But we need not address the issue here. The parties do not identify a specific order in this case directing any proceeds to the Treasury. If one is entered on remand, the lower courts may evaluate in the first instance whether that order would indeed be for the benefit of investors as required by § 78u(d)(5) and consistent with equitable principles.
B
The SEC additionally has sought to impose disgorgement liability on a wrongdoer for benefits that accrue to his affiliates, sometimes through joint-and-several liability, in a manner sometimes seemingly at odds with the common-law rule requiring individual liability for wrongful profits. See, e.g. , SEC v. Contorinis , 743 F.3d 296, 302 (CA2 2014) (holding that a defendant could be forced to disgorge not only what he "personally enjoyed from his exploitation of inside information, but also the profits of such exploitation that he channeled to friends, family, or clients"); SEC v. Clark , 915 F.2d 439, 454 (CA9 1990) ("It is well settled that a tipper can be required to disgorge his tippee's profits"); SEC v. Whittemore , 659 F.3d 1, 10 (CADC 2011) (approving joint-and-several disgorgement liability where there is a close relationship between the defendants and collaboration in executing the wrongdoing).
That practice could transform any equitable profits-focused remedy into a penalty. Cf. Marshall , 15 Wall. at 149. And it runs against the rule to not impose joint liability in favor of holding defendants "liable to account for such profits only as have accrued to themselves ... and not for those which have accrued to another, and in which they have no participation." Belknap , 161 U.S. at 25-26, 16 S.Ct. 443 ; see also Elizabeth v. Pavement Co. , 97 U.S. 126, 24 L.Ed. 1000 (1878).
The common law did, however, permit liability for partners engaged in concerted wrongdoing. See, e.g. , Ambler , 20 Wall. at 559. The historic profits remedy thus allows some flexibility to impose collective liability. Given the wide spectrum of relationships between participants and beneficiaries of unlawful schemes-from equally culpable codefendants to more remote, unrelated tipper-tippee arrangements-the Court need not wade into all the circumstances where an equitable profits remedy might be punitive when applied to multiple individuals.
Here, petitioners were married. 754 Fed.Appx. 505 ; 262 F.Supp.3d at 960-961. The Government introduced evidence that Liu formed business entities and solicited investments, which he misappropriated. Id. , at 961. It also presented evidence that Wang held herself out as the president, and a member of the management team, of an entity to which Liu directed misappropriated funds. Id. , at 964. Petitioners did not introduce evidence to suggest that one spouse was a mere passive recipient of profits. Nor did they suggest that their finances were not commingled, or that one spouse did not enjoy the fruits of the scheme, or that other circumstances would render a joint-and-several disgorgement order unjust. Cf. SEC v. Hughes Capital Corp. , 124 F.3d 449, 456 (CA3 1997) (finding that codefendant spouse was liable for unlawful proceeds where they funded her "lavish lifestyle"). We leave it to the Ninth Circuit on remand to determine whether the facts are such that petitioners can, consistent with equitable principles, be found liable for profits as partners in wrongdoing or whether individual liability is required.
C
Courts may not enter disgorgement awards that exceed the gains "made *1950 upon any business or investment, when both the receipts and payments are taken into the account." Goodyear , 9 Wall. at 804 ; see also Restatement (Third) § 51, Comment h , at 216 (reciting the general rule that a defendant is entitled to a deduction for all marginal costs incurred in producing the revenues that are subject to disgorgement). Accordingly, courts must deduct legitimate expenses before ordering disgorgement under § 78u(d)(5). A rule to the contrary that "make[s] no allowance for the cost and expense of conducting [a] business" would be "inconsistent with the ordinary principles and practice of courts of chancery." Tilghman , 125 U.S. at 145-146, 8 S.Ct. 894; cf. SEC v. Brown , 658 F.3d 858, 861 (CA8 2011) (declining to deduct even legitimate expenses like payments to innocent third-party employees and vendors).
The District Court below declined to deduct expenses on the theory that they were incurred for the purposes of furthering an entirely fraudulent scheme. It is true that when the "entire profit of a business or undertaking" results from the wrongdoing, a defendant may be denied "inequitable deductions" such as for personal services. Root , 105 U.S. at 203. But that exception requires ascertaining whether expenses are legitimate or whether they are merely wrongful gains "under another name." Goodyear , 9 Wall. at 803. Doing so will ensure that any disgorgement award falls within the limits of equity practice while preventing defendants from profiting from their own wrong. Root , 105 U.S. at 207.
Although it is not necessary to set forth more guidance addressing the various circumstances where a defendant's expenses might be considered wholly fraudulent, it suffices to note that some expenses from petitioners' scheme went toward lease payments and cancer-treatment equipment. Such items arguably have value independent of fueling a fraudulent scheme. We leave it to the lower court to examine whether including those expenses in a profits-based remedy is consistent with the equitable principles underlying § 78u(d)(5).
* * *
For the foregoing reasons, we vacate the judgment below and remand the case to the Ninth Circuit for further proceedings consistent with this opinion.
It is so ordered.

Courts have noted the relatively recent vintage of the term "disgorgement." See, e.g. , SEC v. Cavanagh , 445 F.3d 105, 116, n. 24 (CA2 2006). The dissent contends that this recency in terminology alone removes disgorgement from the class of traditional equitable remedies, post , at 1952 (opinion of THOMAS, J.), despite seeming to recognize disgorgement's parallels to restitution-based awards well within that class, post , at 1952 - 1953. It is no surprise that the dissent notes such parallels, given this Court's acknowledgment that "disgorgement of improper profits" is "a remedy only for restitution" that is "traditionally considered ... equitable." Tull v. United States , 481 U.S. 412, 424, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987) ; see also infra , at 1943. The dissent also observes the solid equitable roots of an accounting for profits, post , at 1951 - 1952; accord, infra , at 1942 - 1943 (discussing the equitable origins of the accounting remedy), a remedy closely resembling disgorgement, see infra , at 1943 - 1944. In any event, casting aside a form of relief solely "based on the particular label affixed to [it] would 'elevate form over substance,' " Aetna Health Inc. v. Davila , 542 U.S. 200, 214, 124 S.Ct. 2488, 159 L.Ed.2d 312 (2004), leaving unresolved the question before us: whether the underlying profits-based award conforms to equity practice.

The dissent acknowledges that this Court has "referred to disgorgement as an equitable remedy in some of its prior decisions." Post , at 6 (citing Feltner v. Columbia Pictures Television, Inc. , 523 U.S. 340, 352, 118 S.Ct. 1279, 140 L.Ed.2d 438 (1998) ). While the dissent attempts to discount those cases for having "merely referred to the term" only "in passing," post , at 1953, those cases expressly "characterized as equitable ... actions for disgorgement of improper profits" in analyzing whether certain remedies were traditionally available in equity, Feltner , 523 U.S. at 352, 118 S.Ct. 1279 (citing Teamsters v. Terry , 494 U.S. 558, 570, 110 S.Ct. 1339, 108 L.Ed.2d 519 (1990) ("characteriz[ing] damages as equitable where they are restitutionary, such as in 'action[s] for disgorgement of improper profits' "); Tull , 481 U.S. at 424, 107 S.Ct. 1831 ).

See, e.g. , SEC v. Clark , 915 F.2d 439, 441, 454 (CA9 1990) (requiring defendant to disgorge the profits that his stockbroker made from unlawful trades); SEC v. Brown , 658 F.3d 858, 860-861 (CA8 2011) (per curiam ) (ordering joint-and-several disgorgement of funds collected from investors and concluding that " 'the overwhelming weight of authority hold[s] that securities law violators may not offset their disgorgement liability with business expenses' "); SEC v. Contorinis , 743 F.3d 296, 304-306 (CA2 2014) (requiring defendant to disgorge benefits conferred on close associates).

According to the Government, petitioners "transferred the bulk of their misappropriated funds to China, defied the district court's order to repatriate those funds, and fled the United States." Brief for Respondent 36.

We express no view as to whether the SEC has offered adequate proof of failed attempts to return funds to investors here. To the extent that feasibility is relevant at all to equitable principles, we observe that lower courts are well equipped to evaluate the feasibility of returning funds to victims of fraud. See, e.g. , SEC v. Lund , 570 F.Supp. 1397, 1404-1405 (CD Cal. 1983) (appointing a magistrate judge to determine whether it was feasible to locate victims of financial wrongdoing).